UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

IN RE: THOMAS EDWARD LAWSON
and TRENA RENAY LAWSON

    Debtors

THOMAS EDWARD LAWSON

    Movants

v.

AUGUSTA HEALTH CARE, INC.
DBA/AUGUSTA MEDICAL CENTER
AND AUGUSTA HEALTH

    Respondent

and

GEORGE I. VOGEL, Trustee

    Respondent

Case No. 13-50922

Chapter 7

Motion No. 5

## MOTION TO AVOID JUDICIAL LIEN

Comes now Thomas Edward Lawson, et.al., by counsel, and files this Motion pursuant to Bankruptcy Code § 522(f) and Bankruptcy Rule 4003(d) to avoid a certain lien on real property of the Debtor; and in support hereof states unto the Court as follows:

1. That Debtor filed this proceeding under Chapter 7 of the Bankruptcy Code on July 19, 2013.

2. That Debtor listed Augusta Health Care, Inc, dba/Augusta Medical Center and Augusta Health as an unsecured creditor of Debtor.

3. The Debtor is the fee simple owner of a certain parcel of real estate known as 151 Steeles Lane, Raphine, Augusta County Virginia, 24472 (hereinafter real estate). A recorded copy of the deed to said real estate is attached hereto and made a part hereof as Exhibit A.

4. The appraised value of Debtor's real estate, as of April 9, 2013 is $65,000. (A copy of the appraisal is attached hereto and made a part hereof as Exhibit B).

5. That on March 1, 2011 Augusta Health Care, Inc, dba/Augusta Medical Center and Augusta Health obtained a judgment in the amount of $17,022.10 in the Augusta County Circuit Court against Debtor (Judgment Docket # 110000359) thereby creating a judicial lien against Debtor's real estate. A recorded copy of the aforesaid judgment lien is attached hereto and made a part hereof as Exhibit C.   Said judgment was not for a debt specified in 11 U.S.C. §523(a)(5).

6. That the lien held by Augusta Health Care, Inc, dba/Augusta Medical Center and Augusta Health is a judicial lien/non-possessory, non-purchase money security interest in the real estate.

7. That in addition to Augusta Health Care, Inc, dba/Augusta Medical Center and Augusta Health's lien against the real estate, First National Bank of Arizona/America's Servicing Company holds a Deed of Trust against the real estate as shown by the Deed of Trust of record in the Augusta County Circuit Court Clerk's office at Instrument #070001783, a copy of which is attached hereto and made a party hereof as Exhibit D.

8. As of July 4, 2013, the payoff/unpaid principal balance of the loan to First National Bank of Arizona/America's Servicing Company was $64,060.77.   A copy of the payoff/unpaid principal statement is attached hereto and made a part hereof as Exhibit E.

2

9.      Movant claimed a homestead exemption in the amount of $940.00 for the equity in the real estate on his homestead deed.  A copy of the recorded homestead deed is attached hereto and made a part hereof as Exhibit F.

10.  That Augusta Health Care, Inc, dba/Augusta Medical Center and Augusta Health's judicial lien impairs an exemption to which the Debtor would have been entitled under Bankruptcy Code § 522(b).

11.  Application of 11 U.S.C. § 552(f)(1)(2)(A) results in the following computation:

|      |                                                                      |            |
|------|----------------------------------------------------------------------|------------|
| i)   | the lien                                                             | $17,022.10 |
| ii)  | all other liens on the property                                     | $64,060.77 |
| iii) | the amount of the exemption claimed                                 | $   940.00 |
| iv)  | the sum                                                             | $82,022.87 |
| v)   | value of debtor's interest in real estate                           | $65,000.00 |
| vi)  | Amount of impairment (i.e. amount by which total exceeds Debtor's interest) | $17,022.87 |

12.  That based on the computation under 11 U.S.C. §522(f)(1)(2)(A) Augusta Health Care, Inc, dba/Augusta Medical Center and Augusta Health's lien on debtor's real estate impairs his exemption  to which the debtor would be entitled under 11 U.S.C. § 522(b).

WHEREFORE, the Debtor respectfully requests the Court enter an order avoiding the judicial lien described above and grant debtor such further relief as my be proper and just.

Respectfully submitted,
THOMAS EDWARD LAWSON
By Counsel

 /s/ Jeffrey A. Ward
Jeffrey A. Ward, Esq. (20702)
Counsel for Debtor

3

Franklin, Denney, Ward & Dryer
P.O. Drawer 1140
Waynesboro, Virginia 22980
540-946-4400
540-946-4417 (fax)

<u>CERTIFICATE</u>

I hereby certify that on the 19th day of September, 2013 a copy of the foregoing motion to avoid judicial lien was either served electronically or mailed, via certified mail return receipt requested to the following parties:

Augusta Health Care, Inc,
dba/Augusta Medical Center
and Augusta Health
c/o John W. Sills, III, Registered Agent
PO Box 108
Staunton, VA  24402-0108

George I. Vogel, Trustee (email)
P.O. Box 18188
Roanoke, Virginia 24014

   /s/ Jeffrey A. Ward
Jeffrey A. Ward

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

IN RE:                                          Chapter 7

THOMAS EDWARD LAWSON
AND TRENA RENAY LAWSON,                          Case No. 13-50922
____Debtors____

THOMAS EDWARD LAWSON
     Movant,

v.

AUGUSTA HEALTH CARE, INC.
DBA/AUGUSTA MEDICAL CENTER
AND AUGUSTA HEALTH

and
GEORGE I. VOGEL, TRUSTEE

     Respondents

## NOTICE OF HEARING ON MOTION TO AVOID JUDICIAL LIEN

TO:    DEBTOR, COUNSEL OF RECORD, CHAPTER 7 TRUSTEE

     PLEASE TAKE NOTICE that a hearing will be held at:

TIME:    <u>10:00 A.M.</u>
DATE:    <u>October 16, 2013</u>
PLACE:   Federal Courtroom, 3rd Floor, U.S. Courthouse, 116 N. Main Street, Harrisonburg, VA 22802

on the following matter: **Motion to Avoid Judicial Lien**

Date: September 19, 2013                  Respectfully submitted,
                                          THOMAS EDWARD LAWSON
                                          By: /s/ Jeffrey A. Ward
                                          Of Counsel

Jeffrey A. Ward VSB (#20702)
Franklin, Denney, Ward & Lawson, PLC
P.O. Drawer 1140
Waynesboro, VA 22980
(540) 946-4403 Phone
(540) 946-4417 Fax
jward@fdwdlaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of September, 2013, the foregoing document was served by first class mail, postage pre-paid, or certified mail return receipt requested or electronically via the CM/ECF system, upon the following persons:

> Augusta Health Care, Inc.
> dba/Augusta Medical Center
> and Augusta Health
> c/o John W. Sills, Registered Agent
> P.O. Box 108
> Staunton, VA  24402-0108
>
> George I. Vogel, Trustee (email)
> P.O. Box 18188
> Roanoke, Virginia 24014

> /s/ Jeffrey A. Ward
> Jeffrey A. Ward, Esquire

040005618

PG0470 MAY -3

Tax Map 94-13

THIS DEED, made this 20th of April 2004 by and between **Frank & Anne Gibson Family, LLC**, a Virginia limited liability company, party of the first part, Grantor; and **Thomas Edward LAWSON** of the second part, Grantee, whose address is 151 Steeles Lane, Raphine, VA 24472;

---WITNESSETH---

That for and in consideration of the sum of Ten Dollars ($10.00), cash in hand and other valuable consideration, paid by the party of the second part to the party of the first part, at and before the sealing and delivery of this deed, the receipt of which is hereby acknowledged, the said Grantor, party of the first part, do hereby grant, bargain, sell and convey, WITH GENERAL WARRANTY AND ENGLISH COVENANTS OF TITLE, unto the said **Thomas Edward Lawson**, party of the second part, the following real estate, to-wit:

All of that certain tract or parcel of land with all improvements thereon and appurtenances thereto belonging situate in Riverheads District, Augusta County, Virginia, designated as Lot 1 containing 1.500 acres as shown on plat entitled *Plat of a Division of the Frank & Anne Gibson Family, LLC Property, Riverheads District, Augusta Co. VA.* made by R. E. Funk - Land Surveyor dated October 2, 2003, attached to deed from Frank & Anne Gibson Family, LLC to Berl Patterson of record as Instrument No 030017386 and in Plat Book 1, Page 5754.

Together with the above and as an appurtenance thereto there is further conveyed the nonexclusive right to use the existing 18-foot right of way in common with the Grantee and others to Route 918.

And being a portion of the same property that was acquired by the Grantor by deed from Frank P. Gibson, et al, dated August 24, 2002, of record in said County Clerk's Office as Instrument No 020011620.

This property is conveyed subject an easement 15 feet wide conveyed to Berl Patterson by deed from the Grantor dated October 8, 2003, of record as Instrument No. 030017386 over the 1.5 acre parcel adjoining the existing 18-foot easement to increase the width of the existing 18-foot easement for access to Route 918

Reference is here made to the aforementioned deed, etc. for further description and derivation of title.

This conveyance is made expressly subject to the easements, conditions, restrictions and reservations contained in duly recorded deeds, plats and other instruments constituting constructive notice in the chain of title to the property hereby

Rhea & Miller, P.C., 11 Terry Court, Staunton, VA 24401
540-885-8146    fax 540-886-8913



**PLAINTIFF'S EXHIBIT**

A

PG0471 MAY-3

conveyed, which have not expired by a limitation of time contained therein or otherwise become ineffective.

WITNESS the following signature and seal.

Frank & Anne Gibson Family, LLC

By: _Paul D Gibson_____ (SEAL)
    Paul Gibson, Manager

STATE OF PENNSYLVANIA New Jersey

COUNTY OF _Passaic_____, to wit:

Paul Gibson, Manager of Frank & Anne Gibson Family, LLC acknowledged the foregoing instrument before me in the jurisdiction aforesaid, this 27th day of April 2004.

My commission expires: _Jan 25 2006_____

                                    NANCY E. AGEL
                            Notary Public of New Jersey
                        My Commission Expires Jan. 25, 2006

_____
          Notary Public

| | | | |
|---|---|---|---|
| State Tax | 039 | $ 119.85 | VIRGINIA: In the Clerk's Office of the |
| County Tax | 213 | $ 39.95 | Circuit Court of Augusta County, Va. |
| Transfer Fee | 212 | $ 1.00 | May 3 2004 this |
| Clerk's Fee | 301 | $ 14.50 | writing was admitted to record at |
| St. Library | 145 | $ 1.50 | 3:58 o'clock P. M. and the |
| Tech. Fund | 106 | $ 3.00 | Tax imposed by Section 58.1-802 of the |
| State Tax | 038 | $ 40.00 | Code of Virginia in the amt. of |
| Local Tax | 220 | $ 40.00 | $ 80.00 has been paid. |
| | 036 | 70.00 | TESTE: JOHN B. DAVIS, CLERK |
| TOTAL | | $ 269.80 | By: Karen Frederry, Dep. Clerk |

\Gibson\deed to Lawson

2



## APPRAISAL OF REAL PROPERTY

**LOCATED AT:**
151 Steeles Ln
N ROUTE 918ADJ PATTERSON
RAPHINE, VA  24472

**FOR:**
FRANKLIN, DENNEY, WARD & LAWSON
129 N. WAYNE AVENUE
WAYNESBORO, VA  22980

**AS OF:**
APRIL 9, 2013

**BY:**
WILLIAM B. CASON
CASON APPRAISAL COMPANY
45 STONERIDGE DRIVE, SUITE 201
WAYNESBORO, VIRGINIA  22980



PLAINTIFF'S EXHIBIT
B

## SUMMARY OF SALIENT FEATURES

**SUBJECT INFORMATION**

| | |
|---|---|
| Subject Address | 151 Steeles Ln |
| Legal Description | N ROUTE 918ADJ PATTERSON |
| City | RAPHINE |
| County | AUGUSTA |
| State | VA |
| Zip Code | 24472 |
| Census Tract | 0710.00 |
| Map Reference | 94-13 |

**SALES PRICE**

| | |
|---|---|
| Sale Price | $ NA |
| Date of Sale | NA |

**CLIENT**

| | |
|---|---|
| Borrower/Client | THOMAS LAWSON |
| Lender | FRANKLIN, DENNEY, WARD & LAWSON |

**DESCRIPTION OF IMPROVEMENTS**

| | |
|---|---|
| Size (Square Feet) | 1,682 |
| Price per Square Foot | $ |
| Location | RURAL |
| Age | 1936 |
| Condition | AVERAGE |
| Total Rooms | 6 |
| Bedrooms | 3 |
| Baths | 1 |

**APPRAISER**

| | |
|---|---|
| Appraiser | WILLIAM B. CASON |
| Date of Appraised Value | APRIL 9, 2013 |

**VALUE**

| | |
|---|---|
| Final Estimate of Value | $ 65,000 |

FDW&L

**Summary Appraisal Report**
Property Description

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. 130271

**SUBJECT**

| | | | | |
|---|---|---|---|---|
| Property Address | 151 Steeles Ln | City RAPHINE | State VA | Zip Code 24472 |
| Legal Description | N ROUTE 918ADJ PATTERSON | | County AUGUSTA | |
| Assessor's Parcel No. | | Tax Year 2013 | R.E. Taxes $ 578.88 | Special Assessments $ NA |
| Borrower THOMAS LAWSON | Current Owner THOMAS LAWSON | Occupant: ☒ Owner ☐ Tenant ☐ Vacant | | |
| Property rights appraised ☒ Fee Simple ☐ Leasehold | Project Type ☐ PUD ☐ Condominium (HUD/VA only) | HOA $ NA | /Mo. | |
| Neighborhood or Project Name RAPHINE | Map Reference 94-13 | Census Tract 0710.00 | | |
| Sale Price $ NA | Date of Sale NA | Description and $ amount of loan charges/concessions to be paid by seller | | |
| Lender/Client FRANKLIN, DENNEY, WARD & LAWSON | Address 129 N. WAYNE AVENUE, WAYNESBORO, VA 22980 | | | |
| Appraiser WILLIAM B. CASON | Address 45 STONERIDGE DRIVE, SUITE 201, WAYNESBORO, VA 22980 | | | |

**NEIGHBORHOOD**

| Location | ☐ Urban | ☒ Suburban | ☐ Rural | Predominant occupancy | Single family housing | | Present land use % | Land use change |
|---|---|---|---|---|---|---|---|---|
| | | | | | PRICE $(000) | AGE (yrs) | One family 25 | ☒ Not likely ☐ Likely |
| Built up | ☐ Over 75% | ☒ 25-75% | ☐ Under 25% | | | | 2-4 family | ☐ In process |
| Growth rate | ☐ Rapid | ☒ Stable | ☐ Slow | ☒ Owner | 80 Low 25 | | Multi-family | To: |
| Property values | ☐ Increasing | ☒ Stable | ☐ Declining | ☐ Tenant | 350 High 80+ | | Commercial 20 | |
| Demand/supply | ☐ Shortage | ☒ In balance | ☐ Over supply | ☒ Vacant (0-5%) | Predominant | | VAC 55 | |
| Marketing time | ☐ Under 3 mos. | ☒ 3-6 mos. | ☒ Over 6 mos. | ☐ Vac. over 5% | 125 55 | | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: RAPHINE AREA

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.):
THERE ARE NO APPARENT ADVERSE FACTORS WHICH SHOULD AFFECT THE SUBJECT'S MARKETABILITY  STEADY PRICES
DEMONSTRATE GOOD DEMAND FOR THIS AREA.  SEVERAL NATIONAL COMPANIES ARE LOCATED IN THE COUNTY AREA. THE
SUBJECT HAS ACCESS TO ALL NECESSARY SUPPORTING FACILITIES INCLUDING SCHOOLS, SHOPPING, RECREATION AND
EMPLOYMENT.  THE IMPROVEMENTS CONFORM TO THE SURROUNDING PROPERTIES.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time
-- such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.):
CURRENT INTEREST RATES ARE  4.75 - 5.75% WITH SELLER TYPICALLY PAYING 1 TO 3 POINTS.

**PUD**

Project Information for PUDs (if applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)?   ☐ Yes   ☐ No
Approximate total number of units in the subject project _____   Approximate total number of units for sale in the subject project _____
Describe common elements and recreational facilities:

**SITE**

| | | | |
|---|---|---|---|
| Dimensions IRREGULAR | | Topography | SLOPING |
| Site area 1.5 ACRES | Corner Lot ☐ Yes ☒ No | Size | TYPICAL FOR AREA |
| Specific zoning classification and description GA/GENERAL AG | | Shape | IRREGULAR |
| Zoning compliance ☒ Legal ☐ Legal nonconforming (Grandfathered use) ☐ Illegal ☐ No zoning | | Drainage | ADEQUATE |
| Highest & best use as improved: ☒ Present use ☐ Other use (explain) | | View | AVERAGE |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | |
|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Street | ASPHALT | ☒ | | Landscaping AVERAGE |
| Gas | ☐ NONE | | Curb/gutter | NONE | | | Driveway Surface GRAVEL |
| Water | ☐ WELL | | Sidewalk | NONE | | | Apparent easements PUBLIC |
| Sanitary sewer | ☐ SEPTIC | | Street lights | NONE | | | FEMA Special Flood Hazard Area ☐ Yes ☒ No |
| Storm sewer | ☐ NONE | | Alley | NONE | | | FEMA Zone X  Map Date 09/28/2007 |
| | | | | | | | FEMA Map No. 51015C0625D |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.):   NO ADVERSE
EASEMENTS, ENCROACHMENTS, OR DETRIMENTAL SITE CONDITIONS ARE NOTED. THE SUBJECT LOT IS ADEQUATELY
LANDSCAPED COMPARED TO SURROUNDING PROPERTIES.

**DESCRIPTION OF IMPROVEMENTS**

| GENERAL DESCRIPTION | | EXTERIOR DESCRIPTION | | FOUNDATION | | BASEMENT | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|
| No. of Units | 1 | Foundation | BLOCK | Slab | NO | Area Sq. Ft. | NA | Roof | ☐ |
| No. of Stories | 2 | Exterior Walls | VINYL | Crawl Space | YES | % Finished | NA | Ceiling | ☐ |
| Type (Det./Att.) | DETACHED | Roof Surface | ASPHALT | Basement | NO | Ceiling | NA | Walls | ☐ |
| Design (Style) | 2 STORY | Gutters & Dwnspts. | ALUMINIUM | Sump Pump | NO | Walls | NA | Floor | ☐ |
| Existing/Proposed | YES/NO | Window Type | DHTP | Dampness | SOME | Floor | NA | None | ☐ |
| Age (Yrs.) | 1936 | Storm/Screens | NO/YES | Settlement | YES | Outside Entry | NA | Unknown | ☒ |
| Effective Age (Yrs.) | 48 | Manufactured House | NO | Infestation | NONE | | | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | NA |
| Level 1 | 1 | 1 | 1 | 11 | | | | 1 | 1 | | | 1,179 |
| Level 2 | | | | | | | | 2 | | | | 503 |

Finished area above grade contains:   6 Rooms;   3 Bedroom(s);   1 Bath(s);   1,682  Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | VIN/CPT/WD/AVG | Type | HW | Refrigerator | ☒ | None | ☐ | Fireplace(s) # 1 FP | ☒ | None | ☐ |
| Walls | DRYWALL/AVG | Fuel | GAS | Range/Oven | ☒ | Stairs | ☐ | Patio | ☐ | Garage | ☐ # of cars |
| Trim/Finish | WOOD/AVG | Condition | AVG | Disposal | ☐ | Drop Stair | ☐ | Deck | ☐ | Attached | ☐ |
| Bath Floor | VINYL/AVG | COOLING | | Dishwasher | ☐ | Scuttle | ☒ | Porch FRONT | ☒ | Detached | ☒ |
| Bath Wainscot | DRYWALL/AVG | Central | NONE | Fan/Hood | ☐ | Floor | ☐ | Fence | ☐ | Built-In | ☐ |
| Doors | WOOD/AVG | Other | | Microwave | ☐ | Heated | ☐ | Pool | ☐ | Carport | ☐ |
| | | Condition | AVG | Washer/Dryer | ☐ | Finished | ☐ | | | Driveway | 3 CAR |

Additional features (special energy efficient items, etc.):   FRONT PORCH; DETACHED GARAGE

**COMMENTS**

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction, remodeling/additions, etc.:   THE
SUBJECT IS BEING ADEQUATELY MAINTAINED WITH NO ITEMS OF FUNCTIONAL INADEQUACIES NOTED.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the
immediate vicinity of the subject property:   NO KNOWN OR APPARENT ADVERSE ENVIRONMENTAL CONDTIONS THAT WOULD
NEGATIVELY IMPACT ON THE VALUE OF THE PROPERTY ARE NOTED.

Freddie Mac Form 70  6/93   Form UA2 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE   Fannie Mae Form 1004  6/93

Main File No. 130271 Page #4

FDW&L

# UNIFORM RESIDENTIAL APPRAISAL REPORT
File No. 130271

## Valuation Section

### COST APPROACH

| | | |
|---|---|---|
| ESTIMATED SITE VALUE | = $ | |
| ESTIMATED REPRODUCTION COST-NEW-OF-IMPROVEMENTS: | | |
| Dwelling 1,682 Sq. Ft. @ $ | = $ | |
| Sq. Ft. @ $ | = $ | |
| Garage/Carport Sq. Ft. @ $ | = $ | |
| Total Estimated Cost New | = $ | |
| Less Physical Functional External | | |
| Depreciation | = $ | |
| Depreciated Value of Improvements | = $ | |
| "As-is" Value of Site Improvements | = $ | |
| INDICATED VALUE BY COST APPROACH | = $ | |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property): DUE TO THE EFFECTIVE AGE OF THE SUBJECT A COST APPROACH WAS DEEMED UNRELIABLE

### SALES COMPARISON ANALYSIS

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 151 Steeles Ln RAPHINE | 1796 NEW HOPE CRIMORA AUGUSTA | | 257 SANGERS LN AUGUSTA | | 62 SHALOM RD AUGUSTA | |
| Proximity to Subject | | | | | | | |
| Sales Price | $ NA | $ 70,000 | | $ 65,000 | | $ 71,500 | |
| Price/Gross Living Area | $ | $ 90.44 | | $ 73.53 | | $ 45.57 | |
| Data and/or Verification Source | INSPECTION PUBLIC RECOR | MLS PUBLIC RECORD | | MLS PUBLIC RECORD | | MLS PUBLIC RECORD | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Sales or Financing Concessions | | CONV CONCESSIONS | 0 | CASH CONCESSIONS | 0 | CASH CONCESSIONS | -2,145 |
| Date of Sale/Time | 9/17/2012 | 9/17/2012 | | 6/12/2012 | | 8/17/2012 | |
| Location | RURAL | RURAL | | RURAL | | RURAL | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 1.5 ACRES | 1.13 ACRES | | 2 ACRES | -5,000 | 1.48 ACRE | |
| View | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Design and Appeal | 2 STORY | 2 STORY | | RANCH | | 2 STORY | |
| Quality of Construction | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Age | 1936 | 1947 | | 1969 | | 1930 | |
| Condition | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Above Grade Room Count | Total 6 Bdrms 3 Baths 1 | Total 5 Bdrms 2 Baths 1 | +1,500 | Total 4 Bdrms 2 Baths 1 | +1,500 | Total 6 Bdrms 3 Baths 2 | -2,000 |
| Gross Living Area | 1,682 Sq. Ft. | 774 Sq. Ft. | +13,620 | 884 Sq. Ft. | +11,970 | 1,569 Sq. Ft. | +1,695 |
| Basement & Finished Rooms Below Grade | 0 BASEMENT 0 FINISH | 0 BASEMENT 0 FINISH | | 0 BASEMENT 0 FINISH | | 800 BASEMENT 0 FINISH | -8,000 |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | HW/NONE | FF/NONE | | FF/NONE | | FA/NONE | |
| Energy Efficient Items | WIN/DRS | WIN/DRS | | WIN/DRS | | WIN/DRS | |
| Garage/Carport | 0 GARAGE | CARPORT | -3,000 | 1 CAR ATT | -7,500 | 2 CAR DET | -10,000 |
| Porch, Patio, Deck, Fireplace(s), etc. | PORCH SHED 1 FP | PORCH SHED 0 FP | +1,500 | DECK 0 FP | +500 +1,500 | PORCH BARN 0 FP | |
| Fence, Pool, etc. | NONE STD. KITCHEN | NONE STD. KITCHEN | | NONE STD. KITCHEN | | NONE STD. KITCHEN | |
| Net Adj. (total) | | ☒ + ☐ − $ | 13,620 | ☒ + ☐ − $ | 2,970 | ☐ + ☒ − $ | -20,450 |
| Adjusted Sales Price of Comparable | | Net 19.5 % Gross 28.0 % $ 83,620 | | Net 4.6 % Gross 43.0 % $ 67,970 | | Net 28.6 % Gross 33.3 % $ 51,050 | |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): YOUR APPRAISER HAS COMPLETED A THOROUGH SEARCH OF THIS NEIGHBORHOOD AS WELL AS COMPETING NEIGHBORHOODS IN SURROUNDING AREAS. AFTER AN EXTERIOR INSPECTION OF AND AN ANALYSIS OF DIFFERENT SALES, THE THREE USED ARE THE BEST INDICATORS OF DATA CURRENTLY AVAILABLE. ALL THREE OF THESE SALES ARE CONFIRMED CLOSED. DUE TO THE SMALL SUBURBAN AREA, COMPARABLE SALES WERE LIMITED AND COMPARABLES OVER SIX MONTHS HAD TO BE USED.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source, for prior sales within year of appraisal | NOT SOLD IN THE PAST THREE YEARS | NA NA PUBLIC RECORD | NA NA PUBLIC RECORD | NA NA PUBLIC RECORD |

Analysis of any current agreement of sale, option, or listing of subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: SUBJECT PROPERTY IS NOT CURRENTLY UNDER CONTRACT. NONE OF THE ABOVE COMPARABLE PROPERTIES HAVE SOLD PREVIOUSLY WITHIN THE PAST YEAR.

INDICATED VALUE BY SALES COMPARISON APPROACH $ 65,000

INDICATED VALUE BY INCOME APPROACH (if Applicable) Estimated Market Rent $ N/A /Mo. x Gross Rent Multiplier = $

### RECONCILIATION

This appraisal is made ☒ "as is" ☐ subject to the repairs, alterations, inspections or conditions listed below ☐ subject to completion per plans & specifications.

Conditions of Appraisal: AT THE TIME OF INSPECTION, NO STRUCTURAL OR SAFETY CONDITION WAS NOTED THAT WOULD AFFECT MARKET APPEAL OR REMAINING LIFE OF SUBJECT. THIS IS A SUMMARY APPRAISAL REPORT.

Final Reconciliation: THE DIRECT SALES COMPARISON IS CONSIDERED THE MOST RELIABLE INDICATOR OF VALUE AND IS GIVEN THE MOST WEIGHT. THE INCOME APPROACH WAS NOT USED DUE TO THE PREDOMINANT OWNER OCCUPANCY.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac form 439/FNMA form 1004B (Revised 6/93 ).

I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF APRIL 9, 2013 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 65,000

| APPRAISER: WILLIAM CASON | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature: William Cason | Signature: ☐ Did ☐ Did Not |
| Name: WILLIAM B. CASON | Name: Inspect Property |
| Date Report Signed: May 02, 2013 | Date Report Signed: |
| State Certification # 4001 000131 State VA | State Certification # State |
| Or State License # State | Or State License # State |

Freddie Mac Form 70  6/93   PAGE 2 OF 2   Fannie Mae Form 1004  6-93

Form UA2 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Supplemental Addendum

File No. 130271

| Borrower/Client | THOMAS LAWSON | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 151 Steeles Ln | | | | | | |
| City | RAPHINE | | County | AUGUSTA | State | VA | Zip Code 24472 |
| Lender | FRANKLIN, DENNEY, WARD & LAWSON | | | | | | |

### APPRAISAL DEVELOPMENT AND REPORTING PROCESS

THE APPRAISAL STANDARDS BOARD (ASB) OF THE APPRAISAL FOUNDATION HAS DEEMED THAT THE LEVEL OF DETAIL, SUGGESTS THAT THIS IS A SUMMARY APPRAISAL REPORT. ACCORDINGLY, IT IS INTENDED TO COMPLY WITH THE REPORTING REQUIREMENT SET FORTH UNDER STANDARDS RULE 2-20(b) OF THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE FOR A SUMMARY APPRAISAL REPORT.  AS SUCH, IT PRESENTS ONLY SUMMARY DISCUSSIONS OF THE DATA, REASONING AND ANALYSES THAT WERE USED IN THE APPRAISAL PROCESS TO DEVELOP THE APPRAISER'S IMPARTIAL OPINION OF THE VALUE.  THE NEW TERM "OPINION" IS SYNONYMOUS WITH "ESTIMATE" WHEN THE TERM "ESTIMATE" IS USED FOR "OPINION".  SUPPORTING DOCUMENTATION THAT INS NOT PROVIDED WITH THE REPORT CONCERNING THE DATA, REASONING AND ANALYSES IS RETAINED IN THE APPRAISER'S FILE.

THE CLIENT AND INTENDED USER OF THIS APPRAISAL IS JEFF WARD WHO WILL USE THIS APPRAISAL AS A BASIS FOR MARKET VALUE .

### SCOPE OF THE APPRAISAL

THE SCOPE OF THE APPRAISAL REPORT IS THE FORMULATION OF THE MOST CURRENT APPLICABLE DATA IN RELATION TO THE SUBJECT PROPERTY AND THE MARKET VALUE ESTIMATE.  THE VERIFIED COLLECTED DATA IS PROCESSED THROUGH THE BASIC APPLICABLE APPROACHES OR METHODS--COST, INCOME, DIRECT SALES COMPARISON.  THE SELECTED PROPERTY, THE ADJUSTMENT PROCESS IS DETAILED, ALONG WITH THE RECONCILIATIONS, WITHIN THE APPROPRIATE SECTIONS OF THE APPRAISAL REPORT.

### ADDENDUM TO CONTINGENT AND LIMITING CONDITIONS

IN THE APPRAISAL ASSIGNMENT, THE EXISTENCE OF POTENTIALLY HAZARDOUS MATERIAL USED IN THE CONSTRUCTION OR MAINTENANCE OF THE BUILDING , SUCH AS THE PRESENCE OF AREA FORMALDEHYDE FORM INSULATION, AND/OR EXISTENCE OF TOXIC WASTE, WHICH MAY OR MAY NOT BE PRESENT ON THE PROPERTY HAS NOT BEEN CONSIDERED.  THE APPRAISER IS NOT QUALIFIED  TO DETECT SUCH SUBSTANCES.  THE CLIENT IS URGED TO RETAIN AN EXPERT IN THIS FIELD, IF DESIRED.

THE EXISTENCE OF RADON, A GAS WHICH COMES FROM THE NATURAL BREAKDOWN (RADIOACTIVE DECAY) OF URANIUM, HAS NOT BEEN CONSIDERED.  THE APPRAISER IS NOT QUALIFIED TO DETECT THE ODORLESS, COLORLESS, TASTELESS GAS, THAT MAY POSE A HEALTH HAZARD.  THE CLIENT IS URGED TO RETAIN AN EXPERT IN THIS FIELD, IF DESIRED.

### TO CONFORM WITH THE INTENT OF S. R. 2-3 (CERTIFICATION), IT IS EXPRESSLY UNDERSTOOD THAT:

"I HAVE NO BIAS WITH RESPECT TO THE PROPERTY THAT IS THE SUBJECT OF THIS REPORT, OR TO THE PARTIES INVOLVED WITH THIS ASSIGNMENT.  MY ENGAGEMENT IN THIS ASSIGNMENT WAS NOT CONTINGENT UPON DEVELOPING OR REPORTING PREDETERMINED RESULTS, AND MY COMPENSATION IS NOT CONTINGENT UPON THE OCCURRENCE OF A SUBSEQUENT EVENT DIRECTLY RELATED TO THE INTENDED USE OF THIS APPRAISAL"

### ELECTRONIC SIGNATURE:

THE VIRGINIA REAL ESTATE APPRAISER BOARD, RULES AND REGULATIONS, PART IV, 18 VAC 130-20-180, SECTION C, STATES THAT LICENSED APPRAISERS ARE ALLOWED TO USE DIGITAL SIGNATURES ON ANY APPRAISAL PERFORMED IN THE STATE OF VIRGINIA AS LONG AS THEY HAVE FULL CONTROL OVER THE APPRAISAL PROCESS.

THE AFORE-SIGNED'S DIGITAL SIGNATURE (IF APPLICABLE) IS ACCESSED BY A PASSWORD AND IS UNDER THE SOLE CONTROL OF THE APPRAISER.

## Subject Photo Page

| Borrower/Client | THOMAS LAWSON | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 151 Steeles Ln | | | | | | |
| City | RAPHINE | County | AUGUSTA | | State | VA | Zip Code 24472 |
| Lender | FRANKLIN, DENNEY, WARD & LAWSON | | | | | | |



**Subject Front**

151 Steeles Ln
| | |
|---|---|
| Sales Price | NA |
| Gross Living Area | 1,682 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 1 |
| Location | RURAL |
| View | AVERAGE |
| Site | 1.5 ACRES |
| Quality | AVERAGE |
| Age | 1936 |



**Subject Rear**



**Subject Street**

**DEFINITION OF MARKET VALUE:**  The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

* Adjustments to the comparables must be made for special or creative financing or sales concessions.  No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions.  Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction.  Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:**  The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1.  The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it.  The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title.  The property is appraised on the basis of it being under responsible ownership.

2.  The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3.  The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area.  Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.  The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5.  The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value.  These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6.  The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal.  Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent  conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property.  The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist.  Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7.  The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct.  The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8.  The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9.  The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10.  The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent.  The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

Cason Appraisal Service
Form ACR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**APPRAISER'S CERTIFICATION:**  The Appraiser certifies and agrees that:

1.  I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation.  If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2.  I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report.  I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3.  I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4.  I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction.  I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5.  I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6.  I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal.  I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7.  I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply.  I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8.  I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report.  I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them.  I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9.  I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report.  If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report.  I certify that any individual so named is qualified to perform the tasks.  I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:**  If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:**  _151 Steeles Ln, RAPHINE, VA 24472_

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: _William B. Cason_ | Signature: _____ |
| Name:  WILLIAM B. CASON | Name: _____ |
| Date Signed:  _May 02, 2013_ | Date Signed: _____ |
| State Certification #:  _4001 000131_ | State Certification #: _____ |
| or State License #: _____ | or State License #: _____ |
| State: _VA_ | State: _____ |
| Expiration Date of Certification or License: _11/30/2013_ | Expiration Date of Certification or License: _____ |
|  | ☐ Did   ☐ Did Not Inspect Property |

Form ACR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

110000359

VIRGINIA: IN THE CIRCUIT COURT FOR AUGUSTA COUNTY

AUGUSTA HEALTH CARE, INC. d/b/a
Augusta Medical Center and Augusta Health,

      Plaintiff,

v.                             Case No.  CL10000705

LAWSON, THOMAS, et al.,

      Defendant.

**FINAL ORDER**

        It appearing to the Court that the Plaintiff has complied with the requirements of

Virginia law to secure a default judgment in this matter, and the Defendants having failed to appear

at the hearing on the Plaintiff's Motion for Default Judgment to contest such motion, it hereby is

ORDERED that the Plaintiff's Motion for Default Judgment is granted and judgment is hereby

entered in favor of the Plaintiff and against the against the Defendants, Thomas Lawson and Trena

Lawson, jointly and severally, in the amount of $17,022.10, together with interest thereupon at a rate

of 6.0000% per year from the date of judgment until paid in full, and court costs in the amount of

$107.00.

        It is further ORDERED that the exhibits to the Complaint which the Plaintiff filed

under seal shall be maintained under seal to preserve the privacy of the Defendants' health records.



The signature of the Defendants is waived pursuant to Rule 1:13.

The Clerk is directed to transmit a copy of this Order to counsel for the Plaintiff and

to the Defendants, *pro se*, at 151 Steeles Ln, Raphine VA 24472.

ENTERED: _____
                     Circuit Judge

DATE: _____

**WE ASK FOR THIS:**

_____
Neal L. Walters, Esq. (VSB No. 32048)
Corban A. Klug, Esq. (VSB No. 68323)
Scott | Kroner PLC
418 East Water Street
P.O. Box 2737
Charlottesville, VA 22902
(434) 296-2161
(434) 293-2073 (fax)
nwalters@scottkroner.com
cklug@scottkroner.com

A True and Correct Copy,

Teste: _____ Dep.Clk.
              Circuit Court
       County of Augusta, Virginia

```
              VIRGINIA
       IN THE CLERK'S OFFICE OF
            AUGUSTA COUNTY
        MARCH 1, 2011 AT 03:34PM
  JUDGMENT/RELEASE #110000359 WAS DOCKETED
  UPON CERTIFICATION OF ACKNOWLEDGEMENT
  THERETO ANNEXED, ADMITTED TO RECORD.
   THE FEE IMPOSED BY SEC. 17.1-275(17)
  OF THE VIRGINIA CODE, HAS BEEN PAID.
  RCPT: 11000004072  BK: _____ PG: _____
       TESTE: JOHN B. DAVIS, CLERK
  BY: _____ D.C.
```

2

040005619

PG 0472 MAY -3 28

Return To:
FIRST NATIONAL BANK OF ARIZONA
P.O. BOX 66604
PHOENIX, AZ 85082

Prepared By:
MICHAEL DRAGONETTE
1760 OLD MEADOW RD. 3RD FLOOR
MCLEAN, VA 22102

Tax Map Reference #:
PORTION OF 94-13
RPC/Parcel ID #:

---[Space Above This Line For Recording Data]---

# DEED OF TRUST

MIN  1001355-3274017591-2

The following information, as further defined below, is provided in accordance with Virginia law:

This Deed of Trust is given by  THOMAS EDWARD LAWSON

RHEA & MILLER, PC, 11 TERRY COURT,                    , as
Borrower (trustor), to ~~FIDELITY NATIONAL TITLE INS. CO OF NEW YORK~~

~~POBOX 1549, KNOXVILLE, TN 37923~~   STAUNTON, VA 24401        , as

Trustee, for the benefit of Mortgage Electronic Registration Systems, Inc. as beneficiary.

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

3274LAWSON,TH03          3274017591

VIRGINIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3047  1/01

VMP®-6A(VA) (0102)     MW 02/01     Initials: _____
Page 1 of 15

VMP MORTGAGE FORMS - (800)521-7291



**PLAINTIFF'S EXHIBIT**

D

PG0473 MAY-3 B

**(A) "Security Instrument"** means this document, which is dated    APRIL 30, 2004
together with all Riders to this document.

**(B) "Borrower"** is THOMAS EDWARD LAWSON

Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is FIRST NATIONAL BANK OF ARIZONA

Lender is a CORPORATION
organized and existing under the laws of    UNITED STATES OF AMERICA
Lender's address is  1760 OLD MEADOW ROAD, 3RD FLR, MCLEAN, VA 22102

**(D) "Trustee"** is FIDELITY NATIONAL TITLE INS CO OF NEW YORK

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered
corporation whose principal office is located in Virginia. Trustee's address is
POBOX 1549, KNOXVILLE, TN 37923
**"Trustee"** is

Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered
corporation whose principal office is located in Virginia. Trustee's address is

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated    APRIL 30, 2004
The Note states that Borrower owes Lender SEVENTY ONE THOUSAND THREE HUNDRED FIFTY
AND NO/100                                 Dollars
(U.S. $71,350.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than    MAY 1, 2034    . The interest rate
stated in the Note is EIGHT AND FIVE / EIGHTHS

                         percent (    8.6250    %).
If this Security Instrument is an adjustable rate mortgage loan, this initial rate is subject to change in
accordance with the attached Adjustable Rate Rider.

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

3274LAWSON.TH03               3274017591

PG0474 MAY-3 8

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [ ] Adjustable Rate Rider
- [ ] Condominium Rider
- [ ] Second Home Rider
- [ ] Balloon Rider
- [ ] Planned Unit Development Rider
- [ ] 1-4 Family Rider
- [ ] VA Rider
- [ ] Biweekly Payment Rider
- [ ] Other(s) [specify]

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

3274LAWSON,TH03          3274017591          Initials: _SEZ_

PG 0475 MAY-3 8

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the         CITY                    [Type of Recording Jurisdiction]
of              RAPHINE                                    [Name of Recording Jurisdiction]:
SEE ATTACHED LEGAL DESCRIPTION

which currently has the address of 151 STEELES LANE
                                                                                    [Street]
RAPHINE                                       [City/County], Virginia    24472    [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. Payment of Principal, Interest, Escrow Items. Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

3274LAWSON,TH03                        3274017591                    Initials

VMP -6A(VA) (0102)                    Page 4 of 15                    Form 3047  1/01

PG0476 MAY-3 5

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such

3274LAWSON,TH03                    3274017591

Initials 

PG0477 MAY-3

amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the

3274LAWSON,TH03          3274017591

PG0478 MAY-3

payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or

3274LAWSON,TH03          3274017591          Initials 557          Form 3047 1/01

-6A(VA) (0102)          Page 7 of 15

PG0479 MAY-3

condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage

3274LAWSON.TH03              3274017591                     Initials: *SEZ*

VMP-6A(VA) (0102)            Page 8 of 15                    Form 3047  1/01

PG0480 MAY-3 8

Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

3274LAWSON,TH03            3274017591

PG 0481 MAY-3 8

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the

3274LAWSON.THG3                    3274017591

Initials: _JEZ_

PG0482 MAY-3 8

permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of

3274LAWSON,1H03                    3274017591

-6A(VA) (0102)                    Page 11 of 15                    Initials _____                    Form 3047  1/01

PG0483 MAY-3

Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

3274LAWSON.TH03                    3274017591                    Initials SEZ

-6A(VA) (0109)                    Page 12 of 15                    Form 3047  1/01

PG0484 MAY-3

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

3274LAWSON,TH03                  3274017591

Initials: JEZ

PG0485 MAY-3 &

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
THOMAS EDWARD LAWSON          -Borrower

_____          _____ (Seal)
                                                                          -Borrower

_____ (Seal)          _____ (Seal)
-Borrower                                                          -Borrower

_____ (Seal)          _____ (Seal)
-Borrower                                                          -Borrower

_____ (Seal)          _____ (Seal)
-Borrower                                                          -Borrower

3274LAWSON.TH03          3274017591

(LMP)-6A(VA) (0102)          Page 14 of 15          Form 3047  1/01

PG0486 MAY-3

STATE OF VIRGINIA,        *Hessle*        County, ss:

The foregoing instrument was acknowledged before me this        April 30, 2004        by
THOMAS EDWARD LAWSON

My Commission Expires:    *4-30-07*        _____
                                         Notary Public

3274LAWSON,TH03                 3274017591              Initials
-6A(VA) (0102)                  Page 15 of 15                      Form 3047  1/01

PG0487 MAY-3 ᵴ

Exhibit A

Description

Thomas Edward Lawson
151 Steeles Lane
Raphine, VA 24472

All of that certain tract or parcel of land with all improvements thereon and appurtenances thereto belonging situate in Riverheads District, Augusta County, Virginia, designated as Lot 1 containing 1.500 acres as shown on plat entitled *Plat of a Division of the Frank & Anne Gibson Family, LLC Property, Riverheads District, Augusta Co. VA.* made by R. E. Funk - Land Surveyor dated October 2, 2003, attached to deed from Frank & Anne Gibson Family, LLC to Berl Patterson of record as Instrument No. 030017386 and in Plat Book 1, Page 5754.

Together with the above and as an appurtenance thereto there is further conveyed the nonexclusive right to use the existing 18-foot right of way in common with the Grantee and others to Route 918.

| | | | |
|---|---|---|---|
| State Tax | 039 | $ 107.10 | VIRGINIA: In the Clerk's Office of the |
| County Tax | 213 | $ 35.70 | Circuit Court of Augusta County, Va. |
| Transfer Fee | 212 | $ | May 3 20 04 this |
| Clerk's Fee | 301 | $ 28.50 | writing was admitted to record at |
| St. Library | 145 | $ 1.50 | 4:00 o'clock P. M. and the |
| Tech. Fund | 106 | $ 3.00 | Tax imposed by Section 58.1-802 of the |
| State Tax | 038 | $ | Code of Virginia in the amt. of |
| Local Tax | 220 | $ | $ _____ has been paid. |
| | | | TESTE: JOHN B. DAVIS, CLERK |
| TOTAL | | $ 175.80 | By: Karen Headley Dep. Clerk |

Desc04\Lawson 151 Steeles Lane

# ASC
**AMERICA'S SERVICING COMPANY** ™

Return Mail Operations
PO Box 10388
Des Moines, IA 50306-0388

Statement date 07/04/13
Loan number 1218017424
Property address
151 STEELES LN
RAPHINE VA 24472

### Customer Service 🖥 Online
mortgageaccountonline.com

🖨 Fax
1-866-453-6315

☎ Telephone
1-800-842-7654

Correspondence
PO Box 10328
Des Moines, IA 50306

Hours of operation
Mon - Fri 8 a.m. - 6 p.m. CT
in your time zone

💳 Payments
PO Box 1820
Newark NJ 07101

We accept telecommunications relay service calls.

1MB    00442/000442/000456 0003   1 ACQFTP 106 026

THOMAS EDWARD LAWSON
151 STEELES LN
RAPHINE, VA  24472-2900

### Important messages
**DISASTER PREPARATION**
Our disaster assistance team is here
to help if you are ever affected by a
disaster such as a fire, flood, or storm.
If needed, please contact a customer service
representative at the number above.

This is not a bill, our records indicate your
payments are scheduled to withdraw
automatically. All funds are applied when
sufficient funds have accumulated to make a full
monthly payment as outlined in your mortgage
note. If you are paying off your loan, please
contact us at least five (5) days prior to your next
withdrawal date.

## Summary

| | | | |
|---|---|---|---|
| Payment (principal and/or interest, escrow) | $721.41 | Unpaid principal balance | $64,060.77 |
| | | (Contact Customer Service for your payoff balance) | |
| Total payment | $721.41 | Interest rate | 8.625% |
| | | Interest paid year-to-date | $3,241.68 |
| | | Taxes paid year-to-date | $307.53 |
| | | Escrow balance | $68.67- |

## Activity since your last statement

| Date | Description | Total | Principal | Interest | Escrow | Other |
|---|---|---|---|---|---|---|
| 07/04 | Payment | $721.41 | $93.84 | $461.11 | $166.46 | |
| 06/13 | Mtg ins payment | | | | $59.46- | PMI MORTGAGE INS CO |
| 06/04 | Payment | $721.41 | $93.17 | $461.78 | $166.46 | |
| 05/28 | County tax payment | | | | $307.53- | AUGUSTA COUNTY (W) |
| 05/08 | Mtg ins payment | | | | $59.46- | PMI MORTGAGE INS CO |
| 05/05 | Payment | $721.41 | $92.50 | $462.45 | $166.46 | |
| 04/10 | Mtg ins payment | | | | $59.46- | PMI MORTGAGE INS CO |
| 04/09 | Hazard insurance pmt | | | | $1,091.00- | ERIE INS |

000442/000456 ACQFTP S1-ET-M1-C001

---

# ASC
**AMERICA'S SERVICING COMPANY** ™

Loan number    1218017424

Check here and see
reverse for address
correction.

THOMAS EDWARD LAWSON

00442/000442/000456 0003  1 ACQFTP 106 026



AMERICA'S SERVICING COMPANY
PO Box 1820
NEWARK NJ  07101-1820

Please specify
additional funds

| | | |
|---|---|---|
| Monthly payment x pmt amt | A | $ |
| Additional principal | B | $ |
| Late charges | C | $ |
| Other charges | D | $ |
| Additional escrow | E | $ |
| Total amount enclosed (please do not send cash) | F | $ |



**EXHIBIT**
E
exhibitsticker.com

This is not a bill, but for your information only.

106 1218017424  7 10000072141007491600721410000000  00000001139576430O  8

This document was prepared
by Jeffrey A. Ward, Esquire
Waynesboro, Virginia

**990013514**

PG0059 NOV 22 B

### HOMESTEAD DEED

**Name of Householder**:  Thomas E. Lawson

**Is the householder a disabled veteran entitled to claim the additional exemption under 34-4?** No.

**Address of Householder:**  P.O. Box 193, Verona, VA   24482

**Name(s) and age(s) of dependent(s):**  None

**County/City in which householder resides:**  Augusta County

Description of additional property claimed as exempt and its value:

| | |
|---|---|
| Cash on hand | 25.00 |
| Checking and Savings | 25.00 |
| 1999 State and Federal prorated tax refunds | 800.00 |
| Utility Deposits | 150.00 |
| Garnished wages | 300.00 |

TOTAL CLAIMED                              $ 1,300.00

*Thomas E. Lawson*
Thomas E. Lawson

STATE OF VIRGINIA , AT LARGE;
CITY OF WAYNESBORO TO-WIT:

I,  the undersigned, Notary  Public  in  and  for the State of Virginia, At Large, do certify  that Thomas E. Lawson, on the _15th_ day  of November 1999, has acknowledged the same before me.

My commission expires:   _1-31-00_

*Kathleen L. Smith*
NOTARY PUBLIC

| | | | |
|---|---|---|---|
| State Tax | 039 | $ _____ | VIRGINIA: In the Clerk's Office of the |
| County Tax | 213 | $ _____ | Circuit  Court of Augusta County, Va. |
| Transfer Fee | 212 | $ _____ | _NOV 22_ 19 _99_ this |
| Clerk's Fee | 301 | $ _12.00_ | writing  was admitted to record at |
| St. Library | 145 | $ _1.00_ | _11:32_ o'clock _A_.M. and the |
| Tech. Fund | 106 | $ _3.00_ | Tax imposed by Section 58.1-802 of the |
| State Tax | 038 | $ _____ | Code of Virginia in the amt. of |
| Local Tax | 220 | $ _____ | $ _none_ has been paid. |
| TOTAL | | $ _16.00_ | TESTE: JOHN B. DAVIS, CLERK |
| | | | By: _Judy S Welcher_, Dep. Clerk |



EXHIBIT

F